**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 24-1374**

─────────────

CHRISTINE M. SUGAR,

       Debtor – Appellant,

   v.

MICHAEL BRANDON BURNETT; BANKRUPTCY ADMINISTRATOR,

       Trustees – Appellees.

─────────────

**No: 24-1436**

─────────────

In re: CHRISTINE M. SUGAR,

       Debtor,

------------------------------

TRAVIS P. SASSER,

       Appellant,

   v.

MICHAEL BRANDON BURNETT; BANKRUPTCY ADMINISTRATOR,

       Trustees - Appellees.

─────────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. Louise W. Flanagan, District Judge. (5:23-cv-00082-FL)

---

Argued: December 13, 2024                    Decided: March 5, 2025

Amended: March 12, 2025

---

Before DIAZ, Chief Judge, NIEMEYER, and AGEE, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion in which Chief Judge Diaz and Judge Niemeyer join.

---

**ARGUED:** Travis P. Sasser, SASSER LAW FIRM, Cary, North Carolina, for Appellant. Michael Brandon Burnett, OFFICE OF THE CHAPTER 13 TRUSTEE, Raleigh, North Carolina, for Appellees. **ON BRIEF:** Brian C. Behr, Kirstin E. Gardner, OFFICE OF THE BANKRUPTCY ADMINISTRATOR, Raleigh, North Carolina, for Appellees.

---

2

AGEE, Circuit Judge:

Christine Sugar appeals from the district court's orders affirming the bankruptcy court's finding that Sugar's sale of her residence, without prior court authorization, violated her confirmed Chapter 13 bankruptcy plan (the "Plan"). Along with challenging the bankruptcy court's underlying finding of a violation, Sugar asserts it erred in finding that the violation warranted dismissing her Chapter 13 case and prohibiting her from filing another bankruptcy application for five years. In addition, Travis P. Sasser, Sugar's attorney, separately appeals the district court's affirmance of the bankruptcy court's decision to impose monetary sanctions against him personally.

For the reasons set out below, we conclude that the court did not err in holding that the sale violated the Plan and affirm its decision to impose monetary sanctions against Sasser. But we vacate and remand the judgment against Sugar so that the bankruptcy court can consider the effect of record evidence that she acted on advice of counsel as part of its decision about the appropriate remedy for Sugar's conduct and to explain why it determined that a remedy short of dismissal would fail to adequately redress what happened. Given the particular harshness of dismissal that was then augmented by the sanction of a five-year filing bar, an explanation accounting for the totality of the circumstances is required before any consequence can be imposed as to Sugar.

I.

In September 2019, Sugar filed for Chapter 13 bankruptcy in the Eastern District of North Carolina ("EDNC"). Under Chapter 13, debtors "with regular income" may obtain

3

a "fresh start" and "retain[] possession of" some assets by "discharg[ing] certain unpaid debts" "after the successful completion of a payment plan approved by the bankruptcy court." *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007).

Sugar's residence at the time she filed for bankruptcy is a focal point of the appeal. In her bankruptcy petition, Sugar listed as an asset her condominium residence with a value of $150,000 and subject to several liens. She represented her equity interest in the residence to be $32,348.81 and claimed that same amount as a homestead exemption under North Carolina law. That homestead exemption permits a debtor such as Sugar (i.e., under age sixty-five) to claim as exempt property their "aggregate interest, not to exceed thirty-five thousand dollars ($35,000) in value, in real property or other personal property that the debtor . . . uses as a residence." N.C. Gen. Stat. § 1C-1601(a)(1).[1]

During the pendency of Sugar's bankruptcy proceedings (where she was represented by Sasser), she was subject to the EDNC bankruptcy court's local rules, orders entered in her case, and—after its confirmation—the Plan. As a consequence, both directly (the relevant local rule itself) or indirectly (via orders and the Plan referring to Sugar being subject to its terms), Sugar was instructed that she "must not dispose of any non-exempt property having a fair market value of more than $10,000.00 by sale or otherwise without

---

[1] The Bankruptcy Code lists certain federal exemptions that debtors may claim, but it also permits states to opt out of those exemptions in favor of that state's own exemptions. North Carolina has chosen to opt out, meaning that a North Carolina debtor can exclude from her bankruptcy estate "any property that is exempt under . . . State or local law." 11 U.S.C. § 522(b)(3)(A).

4

prior approval of the trustee and an order of [the bankruptcy] court." E.D.N.C. LBR 4002-1(g)(4) ("the Local Rule").[2]

 In November 2019, the bankruptcy court approved the Plan, which set Sugar's "applicable commitment period" at 36 months and further obliged her to make 60 monthly payments of $203 to the Trustee, for a total projected payment of $12,180.[3] Among its other terms, the Plan stated that property vested upon confirmation of the Plan and that such vested property was to "remain in the possession and control of the Debtor[]" but "subject to the requirements of . . . § 363[] [and] all other provisions of the Bankruptcy Code, Bankruptcy Rules, and Local Rules." J.A. 149. The Plan also "permitted [Sugar] to receive all net proceeds from the sale of vested property and/or exempt property that is sold during the pendency of the case," but that this "provision [did] not prejudice and/or impact the rights of the parties pursuant to 11 U.S.C. [§] 1329." J.A. 150.

 Sugar made her required monthly payments, but on June 9, 2022, the Bankruptcy Administrator requested a status conference based on his belief that Sugar had contracted

---

[2] We follow the lower court's and parties' practice of referring to the Local Rule as requiring a prior court order even though the text of the rule requires the approval of the Chapter 13 Trustee ("Trustee") *and* a court order.

 We also note that the Local Rule has since been amended. This case involves only the version that was in effect during the pendency of Sugar's bankruptcy proceeding.

[3] As detailed below, we have recognized that a Plan's "'applicable commitment period' is a duration to which the debtor is obligated to serve." *Pliler v. Stearns*, 747 F.3d 260, 264 (4th Cir. 2014). The applicable commitment period derives from the 2005 bankruptcy code's revisions aimed at "ensuring that debtors devote their full disposable income to repaying creditors" and is typically three to five years depending on considerations not at issue in this case. *Id.* at 264–65.

to sell her residence even though she had not complied with the Local Rule. The next day, the court docketed the status conference for June 29th.

That same day (June 10), Sugar moved for court approval to sell her residence. Attached to the motion was an executed contract for the sale of the condominium dated April 12, 2022, which listed the sale price as $222,000.

Before the status conference took place, however, Sugar closed on the sale without having obtained a court order. Sasser then withdrew the pending motion for court approval of the sale.

At the status conference, Sasser acknowledged that Sugar had already sold her residence and expressed his position that she had not needed prior court permission to do so. Sasser represented that he had only filed the motion for court approval out of an abundance of caution and had withdrawn it once the sale closed.

As a result, the bankruptcy court issued an order to appear and show cause "why this case should not be dismissed for failure to comply with" the Local Rule. J.A. 300. In tandem with the court's directive and relying on Sugar's failure to comply with the Local Rule and the Plan as well as Sugar's changed financial condition resulting from the sale of her residence, the Chapter 13 Trustee moved, in the alternative, to modify Sugar's Plan, convert the case to a Chapter 7 proceeding, or dismiss her bankruptcy proceeding.

In the interim, i.e., between the status conference and issuance of the show cause order and filing of the Trustee's motion, Sugar used some of the proceeds from the sale of her residence to pay the remaining balance due under the Plan. Specifically, she tendered $5,481 to the Trustee to pay in full the remaining 27 months' worth of Plan payments.

The bankruptcy court considered the show cause order and the Trustee's motion during the same hearing because each responded to the same underlying conduct: Sugar's sale of her residence without having obtained a prior court order and the proceeds that she received as a result of the sale.[4] When questioned about why she closed on the sale of her residence without first obtaining the court's permission, Sugar repeatedly and consistently testified that Sasser had informed her that her residence was exempt in full and that she did not need court approval before selling it. *E.g.*, J.A. 482 ("I asked my bankruptcy attorneys. And . . . I was under the understanding that my house was exempt from the bankruptcy. So, I didn't believe that I needed permission to do anything with it because it was not part of the bankruptcy."); J.A. 503–04 (testifying that her "bankruptcy attorney" "confirmed that the house was exempt"); J.A. 507 ("I have understood myself that the house was exempt based on documents that I saw and what I was told by my attorney."); J.A. 509 ("I asked [Sasser] if there would be any issues or if there were any issues and I was told that the house was exempt so I had the right to sell my house and I could move forward."). She also stated that she was not familiar with the bankruptcy court's local rules and that she did not intend to violate any rules. In addition, she explained that she agreed to Sasser filing the later-withdrawn motion for a court order regarding the sale.

Although Sasser had informed her that "the property was exempt and that I could go ahead and proceed with the sale of the home," "at some point in the future he suggested

---

[4] Sugar sold her home for a purchase price of just shy of approximately $221,000. After she paid off the remaining balance on the liens and the like, she received approximately $94,000 in proceeds from the sale.

7

it may be wise to file this after the fact and I agreed with it just to cover bases," though she "was still under the impression that the property was exempt and that I had the right to do with it what I chose without permission." J.A. 513.

Following Sugar's testimony, the Trustee and Sasser presented arguments about what had occurred and how the bankruptcy court should proceed. For his part, Sasser offered several arguments for why the court could not—and should not—do anything. We need not cover all of them, but discuss some that reappear in this appeal. For example, Sasser argued that the court could not enter any additional orders in Sugar's bankruptcy case save for discharge under 11 U.S.C. § 1328(a) because she was entitled to discharge upon paying off the balance of the amount due under the Plan. Sasser claimed that Sugar's residence had not been part of the bankruptcy estate (and thus subject to oversight in the proceeding) at the time of the sale because the Plan said property vested in the debtor at the time of confirmation. He also maintained that North Carolina's homestead exemption classified Sugar's residence as entirely exempt or "not non-exempt" and thus was not subject to the Local Rule, which applied only to non-exempt properties. More broadly, he asserted the Local Rule was "completely incorrect and unjustified" under the Bankruptcy Code, and thus unenforceable. J.A. 562. And he argued that there had been no harm from Sugar's failure to seek a prior court order, so the court should not penalize her.

The bankruptcy court rejected each of Sasser's arguments and found that dismissal was appropriate because Sugar had intentionally endeavored to skirt her obligations under the Plan and the Local Rule so that she could "skate away with $93,000 and not pay a cent to her creditors." J.A. 564. Its subsequent written order disposed of Sugar's various

arguments opposing a finding of any violation. In discussing the appropriate relief to order

for the violation, the court found that under the circumstances presented, modification of

the Plan was not "appropriate," and that "cause" for dismissal existed under § 1307(c),

which authorized the court to dismiss "for cause." J.A. 67. In the court's view, the

"Debtor's behavior is indicative of bad faith and an unwillingness to abide by the

restrictions that accompany the benefits of a Chapter 13 reorganization." J.A. 68. In support

of that conclusion, the court cited the many times Sugar was informed of the Local Rule in

its orders about her case and in the Plan itself. The court recounted its standard practice for

handling the sale of property during the pendency of a bankruptcy proceeding, and Sugar's

failure to follow that course. It also pointed to the docketed status conference to show that

Sugar should have been on alert that there was a question about her pending sale of the

property and that "[e]ven if [she] did not believe the Local Rule applied to the sale of [her

residence], the proper course of action would have been to request confirmation from the

court that the Local Rule did not apply or seek to be excused from complying with [it]."

J.A. 68. In addition, the court noted that Sugar "may" have acted "to avoid a court order

protecting a portion of the Sale Proceeds until the Trustee had an opportunity to consider

modification of the Plan." J.A. 68.

The bankruptcy court further deemed it appropriate to bar Sugar from filing for

bankruptcy for a period of five years. It first noted that "cause" for this bar existed under

11 U.S.C. § 349, and that Sugar's conduct also met the criteria for imposition of sanctions

under *Taggart v. Lorenzen*, 587 U.S. 554 (2019). J.A. 69. This was so, the court

determined, because Sugar "had no objectively reasonable basis to think that the sale of

the Property without court approval and without complying with the Local Rule was appropriate." J.A. 69–70. The court specifically pointed to her knowledge of the court-approval requirement in multiple orders as well as her confirmed Plan, that she was reminded of the provision's existence by the Administrator's filing the motion for a status conference, that she had filed a motion for a court order to render her in compliance, and that she had decided to proceed with the sale despite these pending matters. The bankruptcy court scheduled a sanctions hearing regarding both Sugar and Sasser.

During that sanctions hearing, the Bankruptcy Administrator expressed his view that dismissal with a five-year refiling bar was a sufficient sanction against Sugar, but that monetary sanctions were also appropriate against Sasser. The bankruptcy court ultimately agreed with that recommendation, concluding that Sugar's conduct was adequately addressed by its earlier order, but that Sasser's conduct warranted sanctions "to enforce the Local Rule and ensure future compliance, not only by Mr. Sasser but all members of the bar." J.A. 749.

At the hearing, Sasser had testified and argued in opposition to any sanction, contending that he had correctly advised Sugar in her proceeding and that Sugar did not violate the Local Rule when she sold her property without first obtaining the court's permission. Sasser maintained that he had nothing to apologize for because he'd advised his client correctly based on his reasonable belief that her property was exempt. The bankruptcy court expressed reservations about Sasser's arguments not only because it had previously ruled against him on the merits of those arguments when it determined that Sugar's conduct violated the Local Rule and dismissed her Chapter 13 proceedings, but

10

also because it had rejected similar arguments Sasser had made in a separate bankruptcy proceeding in which he was also counsel. Nevertheless, the court permitted Sasser considerable latitude to defend his legal position. Sasser also took the stand as a fact witness, testifying on several points that corroborated Sugar's earlier testimony about his communications to her and others about the sale. For example, he explained that he communicated to them "that the property was exempt and it had vested at confirmation, but I could get . . . her a court order" if the realtor or mortgage lender needed one. J.A. 668. He recounted that when the mortgage servicer's attorney expressly brought up the Local Rule with him, he "adamantly said we do not need a court order, the [L]ocal [R]ule does not apply. I never said I wasn't going to follow the [L]ocal [R]ule. I said it doesn't apply." J.A. 669. Sasser explained that he had not agreed with the Bankruptcy Administrator's position expressed in the motion for a status conference, but that he filed the motion to sell property "out of an abundance of caution, just in case, for whatever reason, it was needed, I wanted to have it pending" to avoid delay of the sale. J.A. 670. Sasser testified that when learned that the sale had closed, he withdrew the motion because he believed "it was just a moot point." J.A. 671.[5]

The court determined that "Mr. Sasser, on the other hand, is a different matter," and that monetary sanctions were appropriate against him. J.A. 717. The court observed that Sasser put his client "in a worse position just because of a rule or rules that her lawyer, Mr.

---

[5] The testimony of Sugar and Sasser is unclear on whether Sugar was aware of Sasser's decision to withdraw the motion before he did so. The bankruptcy court found that Sasser acted on his own in withdrawing the motion.

Sasser, did not agree with. And that's not fair to her," J.A. 718, acknowledging that Sasser wholeheartedly believed his view, but that "doesn't make it right," J.A. 717. Pointing to Sasser's twenty-plus years of practicing bankruptcy law, the court observed that Sasser knew the Local Rule required Sugar to obtain a court order before she sold her residence, that the court routinely granted those orders, even *nunc pro tunc*, to allow the sale to proceed while giving the parties time to consider the effect of the sale on the proceedings. The court concluded that "[b]y ignoring the Local Rule, Mr. Sasser assisted [Sugar] in avoiding the court's oversight of the sale and the Sale Proceeds." J.A. 750.

The court then found, to the extent the Supreme Court's standard for civil sanctions orders announced in *Taggart* applied, there was "no fair ground of doubt whether the Local Rule applied to the sale of the Property." J.A. 751 (citing *Taggart*, 587 U.S. at 557). It observed that any doubt as to the applicability of the Local Rule to property subject to North Carolina's Homestead Exemption was settled by a prior order issued by the same judge in an earlier bankruptcy proceeding in which Sasser had served as counsel. It also pointed to Sasser having notice of the Bankruptcy Administrator's concerns about proceeding with the sale without a court order, as reflected when it moved for a status conference. The court concluded that Sasser's advice to proceed with the sale notwithstanding this knowledge showed a "lack of deference to the Local Rule and orders of this court," which "harmed the integrity of this court and the bankruptcy system as a whole," thus warranting sanctions under § 105, the court's inherent power to sanction those who come before it, and North Carolina Local Bankruptcy Rule 9011-3. J.A. 752. The court also found that it had authority to sanction Sasser under Rule 9011 of the Federal

Rules of Bankruptcy Procedure in light of his decision to withdraw the motion for a court order without disclosing that the sale had already taken place. Because of these grounds for sanctioning Sasser, and because of the "aggravating factors that Mr. Sasser has refused to apologize for his course of action and that he should know better as a seasoned member of this bar," the court ordered him to pay a $15,000 monetary sanction.[6] J.A. 754.

Sugar and Sasser appealed the bankruptcy court's orders to the district court, which affirmed, agreeing with each of the bankruptcy court's findings and the relief ordered. *Sugar v. Burnett*, No. 5:23-cv-082-FL, 2024 WL 1336671 (E.D.N.C. Mar. 28, 2024); *Sasser v. Burnett*, No. 5:23-cv-411-FL, 2024 WL 1750552 (E.D.N.C. Apr. 23, 2024).

Thereafter, Sugar and Sasser noted timely appeals, which the Court consolidated for briefing and argument. We have jurisdiction under 28 U.S.C. § 1291.

## II.

On appeal, Sugar—who is still represented by Sasser—and Sasser, on his own behalf, raise multiple arguments seeking to have the orders entered against them reversed or modified. In conducting our review, we've grouped the arguments into the following general categories: first, we consider the challenge to the bankruptcy court's determination that Sugar violated the Local Rule when she sold her residence without a court order. Second, we consider whether the bankruptcy court abused its discretion in ruling that this violation was intentional and thus warranted dismissal of Sugar's bankruptcy proceedings

---

[6] The court's bench ruling originally imposed a $10,000 sanction, but the court's later written decision increased the amount to $15,000 after discovering "other instances of Mr. Sasser's defiance and lack of candor with the court." J.A. 754.

13

and a five-year prohibition on filing for bankruptcy. Third, we consider whether the bankruptcy court abused its discretion by imposing monetary sanctions on Sasser.

## A.

We turn first to the arguments urging us to reverse the lower courts' determinations that Sugar violated the Local Rule when she sold her residence before obtaining the bankruptcy court's permission.

### 1.

Sugar raises two threshold arguments challenging whether the bankruptcy court could even consider the applicability of the Local Rule to her sale: (1) the Local Rule is invalid, and (2) paying off the balance due under the Plan entitled her to immediate discharge and deprived the bankruptcy court of authority to consider any other matters. The text of the Plan leads us to reject both arguments.

Under 11 U.S.C. § 1327(a), "[t]he provisions of a confirmed plan bind the debtor and each creditor." Consistent with this view of a confirmed plan as a binding contract, we have held that "neither a debtor nor a creditor can assert rights that are inconsistent with its provisions," though a confirmed plan can be modified as permitted by the plan and governing standards. *In re Varat Enterprises, Inc.*, 81 F.3d 1310, 1317 (4th Cir. 1996) (citing *Stoll v. Gottlieb*, 305 U.S. 165, 170–71 (1938)); *see In re Murphy*, 474 F.3d 143, 148 (4th Cir. 2007) ("A confirmed Chapter 13 plan is a new and binding contract, sanctioned by the court, between the debtors and their pre-confirmation creditors. Like other contracts, a confirmed Chapter 13 plan is subject to modification." (cleaned up)).

Sugar's contention that the Local Rule is invalid fails because, regardless of its facial validity as a local rule, she agreed to be bound by its provisions under the plain language of her confirmed Plan. The proper time for lodging any objections to the validity of the Local Rule or seeking not to be bound by it would have been before or in the confirmation process, not years later. Instead, Sugar agreed to the terms of her Plan, which plainly and unreservedly stated that she would also be subject to the Local Rule. *See* J.A. 149 (Part 7.2: "The use of property by the Debtor(s) remains subject to the requirements of . . . [the] Local Rules."). As a matter of simple contract enforcement, then, Sugar cannot now object to the general proposition that the Local Rule governed her conduct following Plan confirmation.

Nor did paying off the balance due under the Plan deprive the bankruptcy court of authority to rule on its order to show cause and the Trustee's motion to modify or dismiss. Sugar argues that as soon as she paid the remaining balance of her agreed-to monthly payments, she was entitled to immediate discharge under 11 U.S.C. § 1328(a). That argument overlooks one of Sugar's other obligations under the Plan: her applicable commitment period. In brief and relevant part, Part 2 of the Plan required Sugar to make regular payments to the Trustee in the amount of $203 per month for 60 months for a total estimated payment of $12,180 and Part 2.5 of the Plan stated that Sugar's "applicable commitment period" was 36 months. J.A. 146–47. We have previously held that an "applicable commitment period" "is a length-of-time requirement for Chapter 13 plans." *Pliler*, 747 F.3d at 264. This "temporal requirement" "is a freestanding plan length requirement" separate and apart from any additional obligation to repay a particular

amount. *Id.* (quotation marks omitted). While Sugar or the Trustee could have moved to modify the applicable commitment period at any time, neither did so. As such, the applicable commitment period remained in force despite Sugar's satisfaction of her separate obligation to make certain payments under the Plan. Thus, she was not entitled to discharge at that time under § 1328(a), and the bankruptcy court continued to have authority to entertain other motions relating to Sugar's still-pending bankruptcy proceedings.

2.

Having rejected Sugar's threshold arguments, we next turn to her contentions that the Local Rule did not apply to the sale of her residence. As recited earlier, the Local Rule required Sugar to obtain an order authorizing the disposal of "any non-exempt property" valued at more than $10,000. EDNC Local Rule of Bankruptcy 4002-1(g)(4) (directing that "[a]fter the filing of the petition and until the plan is completed, the debtor shall not dispose of any non-exempt property having a fair market value of more than $10,000 by sale or otherwise without prior approval of the trustee and an order of the court"). In one fashion or another, each of Sugar's arguments rests on the mistaken belief that her residence did not constitute "non-exempt property" subject to this Local Rule.

First, Sugar contends that the North Carolina homestead exemption, regardless of the plain language of the statute, exempted the entire property not subject to a lien from the bankruptcy estate. In effect, Sugar's argument simply rewrites the statute contrary to its plain meaning and we reject this argument because North Carolina's homestead exemption is a dollar-limited exemption. With certain caveats not relevant to this case, the

16

North Carolina statute permits a debtor such as Sugar to exempt from her bankruptcy estate "[t]he debtor's aggregate *interest, not to exceed thirty-five thousand dollars ($35,000) in value*, in real property . . . that the debtor or a dependent of the debtor uses as a residence . . . ." N.C. Gen. Stat. § 1C-1601(a)(1) (emphasis added). The text speaks for itself, allowing a debtor to exempt a dollar-limited interest in property, not the property in kind. Indeed, Sugar's application for bankruptcy recognized this fact, noting that the value of her residence was "Claimed as Exempt Pursuant to NCGS 1C-1601(a)(1)" in the amount of "[$]32,348.81." J.A. 106.

This understanding of the North Carolina homestead exemption is not novel, as we have previously held the same, albeit in an unpublished decision, recognizing: "this exemption stands in contrast to exemptions which pertain to certain property in kind or in full regardless of value." *Reeves v. Callaway*, 546 F. App'x 235, 237 (4th Cir. 2013) (per curiam). In the context of the Chapter 7 bankruptcy at issue in that case, we rejected the debtors' argument that claiming the North Carolina homestead exemption "removed [the] Residence in its entirety from the bankruptcy estate, such that the bankruptcy court lacked statutory authority to grant the Trustee permission to sell it." *Id.* at 239. Rejecting that proposition as "without merit," we noted its "fatal flaw" as "ignor[ing] the distinction between exempting an asset itself from the bankruptcy estate and exempting an interest in such asset from the bankruptcy estate." *Id.* While the exemption entitled the debtor to the statutory portion of the residence's value, it did not entitle the debtor to claim the residence as a whole as exempt from the control of the bankruptcy court. *Id.* at 241–42. While the differences between Chapter 7 and Chapter 13 proceedings distinguish what can be done

17

with the property within the context of a debtor's bankruptcy, those differences have no bearing on the fundamental character of the North Carolina homestead exemption as a dollar-limited exemption. For these reasons, we reject Sugar's contention that her residence was entirely exempt as a result of her claiming this exemption.

Next, Sugar contends that even if the North Carolina homestead exemption allowed her to exempt only a dollar amount, the residence was nonetheless properly classified as "partially exempt" rather than "non-exempt." As support, she points to dictionary definitions for the prefix "non-," such as "not" or "no," and argues that those absolutes are not the same as being partly so. This argument is too clever by half. As the bankruptcy court aptly observed, "[p]roperty, depending upon value and liens, may have aspects of both exempt and non-exempt property." J.A. 736. And that is true of Sugar's residence, which comprised three parts: (1) the part subject to liens and not the focus of this argument; (2) the part Sugar claimed as exempt under the North Carolina homestead exemption; and (3) the part (her equity) that remained, if there was any difference between the market value and the sum of (1) and (2). This third part is properly classified as "not exempt." Thus, it could be equally correct to describe Sugar's residence as "partially exempt" or "partially non-exempt," but neither use of the qualifier "partially" transforms what is not exempt into what is exempt or vice versa. By its plain terms, the Local Rule applied to the disposal of *any* of Sugar's non-exempt property valued at over $10,000. As a practical matter, Sugar chose to sell the entire residence, which comprised exempt and non-exempt parts, but that blended reality of the one transaction did not somehow relieve her of complying with the Local Rule. Because Sugar's decision involved the sale of non-exempt property valued at

over \$10,000, the Local Rule applied to the transaction and she was required to obtain a court order before proceeding.[7]

Last, Sugar contends that the Local Rule did not apply because the Plan provided for property to vest with her upon Plan confirmation, at which point the entire residence was removed from the bankruptcy estate and thus no longer "exempt" or "non-exempt." We have previously recognized that "when property vests in the debtor, it vests 'free and clear of any claim or interest of any creditors provided for by the plan.'" *Trantham v. Tate*, 112 F.4th 223, 231 (4th Cir. 2024) (quoting 11 U.S.C. § 1327(b)–(c)). And we have further recognized as a general matter that while vesting generally means that "the debtor is free to use, sell, or lease that [vested] property as she sees fit," "when a debtor experiences a 'substantial and unanticipated' change of income from selling property that vested in [her] at plan confirmation, the trustee maintains the ability to seek to modify the debtor's plan so that unsecured creditors can recoup such income." *Id.* (cleaned up).

Those general principles rejecting Sugar's argument apply with particular force here given that her Plan expressly limited her conduct relating to vested property, particularly by continuing to subject her to the Local Rule she now says did not apply to her.

---

[7] Relatedly, Sugar contends that because the petition-filing date is the usual date to determine exemption status, any appreciation in her residence's value that occurred after the filing date did not yet exist and thus had no classification as exempt or non-exempt. She argues that the bankruptcy court erred in relying on the sale date to identify part of the residence—the post-filing appreciation value—as non-exempt property that was subject to the Local Rule. We find no merit to this argument, which treats classification of estate property as static as of the date of filing a petition. But it's not, as evidenced by the fact that non-exempt property a debtor acquires after a petition is filed can become part of the bankruptcy estate. *See* 11 U.S.C. §§ 541, 1306; *see also Carroll v. Logan*, 735 F.3d 147, 151 (4th Cir. 2013).

19

Specifically, Part 7 of the Plan addressed vesting, confirming that "[p]roperty of the estate will vest in the Debtor[s] upon" "plan confirmation," but the very next paragraph noted that Sugar's use of vested property remained subject to the Local Rule and other provisions that may result in modification of the Plan. J.A. 149. It unambiguously stated that "[t]he use of [vested] property by the Debtor(s) remains subject to the requirements of . . . [the] Local Rules." J.A. 149. Sugar's argument conflates vesting with what it means for property to be non-exempt, and it ignores the plain language of her Plan.

\* \* \* \*

For the reasons explained, we reject each of Sugar's arguments challenging the district court's determination that she violated the Local Rule when she sold her residence without a court order.

## B.

The question of whether there was a violation of the Local Rule (and thus the Plan) is distinct from the issue of what consequences are appropriate to redress that violation. And before discussing separately the bankruptcy court's decisions as to Sugar and Sasser, we first address some overarching principles that a court must consider in reaching its determination.

Bankruptcy courts have a "broad grant of judicial power set forth in 11 U.S.C. § 105(a)" to "'issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,'" including "any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.'" *In re Kestell*, 99 F.3d 146, 148 (4th Cir. 1996) (quoting 11 U.S.C. § 105(a)). This Court has

20

recognized that this provision encompasses the bankruptcy court's authority to dismiss a bankruptcy case for lack of good faith, *id.* at 149, and to hold a party in civil contempt of court and impose sanctions, *In re Walters*, 868 F.2d 665, 669 (4th Cir. 1989).

Beyond § 105(a)'s broad grant of authority, when circumstances so warrant, bankruptcy courts overseeing a Chapter 13 proceeding have specific statutory authority to respond to changed circumstances or violations that occur during a pending case. For example, a court can modify a confirmed plan under 11 U.S.C. § 1329, upon a showing "that the debtor experienced a 'substantial' and 'unanticipated' post-confirmation change in his financial condition." *In re Murphy*, 474 F.3d at 149 (quoting *In re Arnold*, 869 F.2d 240, 243 (4th Cir. 1989)). And under 11 U.S.C. § 1307, the court can convert the case to a Chapter 7 proceeding or dismiss it outright upon a showing of "cause." While § 1307(c) does not define "cause," it provides a non-exhaustive list of examples, including "material default by the debtor with respect to a term of a confirmed plan," and case law has further recognized that this term includes bad faith. *In re Kestell*, 99 F.3d at 148.

The Supreme Court has offered some direction on when dismissal is appropriate under § 1307(c), cautioning that this harsh result should be reserved for the "atypical litigant" and "extraordinary case[]." *Marrama*, 549 U.S. at 375 & n.11. In doing so, the Supreme Court has acknowledged that "[n]othing in the text of . . . § 1307(c) . . . limits the authority of the [bankruptcy] court to take appropriate action[, including dismissing a bankruptcy proceeding,] . . . by the atypical litigant who has demonstrated that he is not entitled to the relief available to the typical debtor." *Id.* at 374–75. And while the Supreme Court has not yet "articulate[d] with precision what conduct qualifies as 'bad faith'

sufficient to permit a bankruptcy judge to dismiss a Chapter 13 case," it has nonetheless "emphasize[d] that the debtor's conduct must, in fact, be atypical" such that dismissal is "[l]imit[ed] . . . to extraordinary cases." *Id.* at 375 n.11.

Intertwined with those concepts is the bankruptcy court's authority to hold a party in civil contempt and impose appropriate sanctions against parties or attorneys. That authority can derive from § 105(a), under which a bankruptcy court can enter an order of civil contempt and impose sanctions to "coerce" compliance or "compensate" for losses arising from noncompliance with its orders. *Taggart*, 587 U.S. at 560. Before elaborating on *Taggart*'s standard for imposing sanctions, however, we first recognize that it involved a Chapter 7, not a Chapter 13, bankruptcy proceeding. *Id.* at 557. We have not yet opined on whether *Taggart* applies to Chapter 13 proceedings and both the lower courts and the parties assume that it does. And in *Beckhart v. NewRez LLC*, 31 F.4th 274 (4th Cir. 2022), we held that the *Taggart* standard governed Chapter 11 proceedings, observing that "[n]othing about the Supreme Court's analysis in *Taggart* suggests . . . that the Court's decision turned on considerations unique to the Chapter 7 context," and that the Court's analysis began with generally applicable bankruptcy provisions. 31 F.4th at 277–78. The reasoning of *Beckhart* applies equally in the context of Chapter 13 cases, thus making the *Taggart* standard appropriate in assessing civil contempt sanctions imposed in a Chapter 13 proceeding such as the one before us.

The Supreme Court emphasized in *Taggart* that an "objective" standard applies when determining whether to impose such sanctions, meaning that there must not be "a 'fair ground of doubt' as to whether the . . . conduct might be lawful." 587 U.S. at 565.

Thus, while "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable," "a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Id.* at 561–62.

In addition to these overarching rules pertinent to sanctioning parties and attorneys in a bankruptcy proceeding, the EDNC specifically authorizes sanctions when "any attorney or party willfully fails to comply with any Local Bankruptcy Rule of this court." Rule 9011-3(a). And whenever a bankruptcy court holds parties or attorneys in contempt, it has "broad discretion" to fashion an appropriate sanction. *De Simone v. VSL Pharms., Inc.*, 36 F.4th 518, 535–36 (4th Cir. 2022).

Given the above principles, there's no question that the bankruptcy court had the *authority* to enter the orders that it did in this case as to both Sugar and Sasser.[8] The question then becomes whether it correctly exercised that authority on the record before it.

---

[8] To clarify given the multitude of orders in this case, the bankruptcy court decided to exercise its authority to dismiss Sugar's Chapter 13 proceeding "for cause" under § 1307 after determining that she had acted in bad faith by intentionally violating the Local Rule. J.A. 67–69. (For its part, the district court also understood the bankruptcy's decision to dismiss the proceeding as the relief ordered under § 1307(c) for the violation of the Local Rule as opposed to sanctions per se. *See* J.A. 909–10.)

In contrast, the five-year prohibition on refiling appears to have been grounded on split reasoning, as the bankruptcy court first recognized its statutory ability to impose a five-year prohibition on refiling "for cause" under § 349, and then also referred to this bar as a civil contempt sanction to which the *Taggart* standard applied. J.A. 69, 716–17 ("I think [Ms. Sugar] was a victim of some very poor advice. And so I think that the suffering that she has received for the five year prohibition of future filing is enough. . . . I'm not going to impose any additional sanctions upon Ms. Sugar.").

(Continued)

1.

We consider first the bankruptcy court's decision to dismiss Sugar's bankruptcy proceeding and impose a five-year prohibition on refiling for bankruptcy. For the reasons that follow, we vacate the judgment against Sugar and remand so that the bankruptcy court can fully assess and explain the remedy it decides to impose as a consequence of the violation of the Local Rule and her confirmed Plan.

To put it briefly, the court's entire analysis as to Sugar suffered because it failed to consider what, if any, effect evidence that she acted according to Sasser's incorrect advice that her residence was exempt and that she did not need to obtain a court order before selling her residence. This fundamental omission connects to our other concerns with the adequacy of the court's explanations about why *dismissal* was warranted and why an additional five-year prohibition on refiling a bankruptcy petition was also included.

We begin by briefly recounting the uncontradicted record evidence showing that Sugar relied on Sasser's advice when selling her residence during her Chapter 13 bankruptcy proceeding. Throughout her testimony during the show-cause and motions hearing, Sugar repeatedly expressed that when her realtor and others involved in the sale of her residence raised the issue of whether a court order was necessary to proceed, she

---

Similarly, the imposition of monetary sanctions against Sasser personally was entirely a sanction that the court ordered while citing four independent grounds of authority: (1) § 105(a), as informed by the *Taggart* standard; (2) the court's inherent power to impose sanctions in the face of "unapologetic defiance" of the court's rules and orders, J.A. 752; (3) Federal Rule of Bankruptcy Procedure 9011, which requires counsel to disclose pertinent information and facts relevant to filings; and (4) EDNC Local Bankruptcy Rule 9011-3.

24

both asked Sasser about this issue and had him communicate with them about it. Based on Sasser's representations to Sugar, she was under the belief that her residence as a whole was "exempt," that she was free to sell the property at her discretion, and that she did not need anyone's permission before doing so. *E.g.*, J.A. 482 ("I asked my bankruptcy attorneys. . . . I was under the understanding that my house was exempt from the bankruptcy. So, I didn't believe that I needed permission to do anything with it because it was not part of the bankruptcy."); J.A. 503 ("I asked my bankruptcy attorney [who] . . . confirmed that the house was exempt."); J.A. 507 ("I have understood myself that the house was exempt based on documents that I saw and what I was told by my attorney.").[9] Consistent with Sugar's representations, Sasser's later testimony during the sanctions hearing confirmed that he had advised Sugar that her property was fully exempt and that she did not need a court order before selling her home, and that he reiterated that view to those involved in the sale of her property. On this record, Sugar may well have a viable argument that she reasonably believed that her actions complied with her Plan and any governing rules, and that she formed that belief and acted based on the advice of Sasser, her bankruptcy attorney.

---

[9] Indeed, at the hearing, the bankruptcy court asked questions consistent with its articulated belief that Sugar may have been acting based on Sasser's counsel and that this fact would not be a defense to finding a violation, but could influence its decision about what relief to order, including whether to impose sanctions. Regardless of that viewpoint, the court's written order did not address this evidence or evaluate the role of advice of counsel in making its decision to dismiss Sugar's Chapter 13 proceeding and impose a five-year refiling bar.

25

This is so in part because a debtor's good faith reliance on advice of counsel is part of the totality of circumstances relevant to determining whether "cause" exists to dismiss under § 1307(c).[10] Admittedly, we have not previously addressed advice of counsel in the precise context of the appropriate relief for violating a Local Rule that a debtor had agreed to abide by in her confirmed Plan, but our conclusion finds support in existing case law. Namely, if the "cause" relied on to dismiss is a debtor's "bad faith," then courts must consider the totality of the circumstances—including evidence of advice of counsel—when assessing whether the requisite bad faith exists. *E.g.*, *In re Brown*, 742 F.3d 1309, 1317 (11th Cir. 2014) (citing other circuit courts to support the conclusion that bankruptcy courts look to the totality of the circumstances to assess good and bad faith); *see also In re U.S. Optical, Inc.*, 991 F.2d 792, *4 (4th Cir. 1993) (table dec.) (concluding that bad faith is grounded in the "totality of the circumstances" and "[n]o one single factor will show bad faith"). In considering dismissal of a Chapter 7 proceeding for "cause" based on a debtor's bad faith, we have previously recognized that "bad faith" "does not lend itself to a strict formula" and that "[c]ourts must consider the totality of the circumstances underlying each case to determine whether a debtor has acted in bad faith." *Janvey v. Romero*, 883 F.3d 406, 412 (4th Cir. 2018) (quoting *In re Piazza*, 719 F.3d 1253, 1271 (11th Cir. 2013)). This same understanding of "bad faith" applies in the context of considering "cause" to dismiss a Chapter 13 proceeding under § 1307(c). Given that dismissal is a harsh remedy and courts

---

[10] This observation would hold true for a court's determination of "cause" to either dismiss or convert to Chapter 7. Because the bankruptcy court dismissed here, the rest of our discussion focuses on the even narrower circumstances in which there may be cause to dismiss.

should "maintain the balance of remedies in bankruptcy," the Court has acknowledged that "the bar for finding bad faith is a high one" and should be found "only where the petitioner has abused the provisions, purpose, or spirit of bankruptcy law." *Id.* at 412 (cleaned up). That holding comports with the Supreme Court's guidance that not every violation—or even every "cause"—will support the severe remedy of dismissing the debtor's case as opposed to ordering different relief. Instead, courts must consider whether the case presents an "atypical litigant" whose misconduct constituted an "extraordinary case." *Marrama*, 549 U.S. at 375 & n.11.

Our concern about the potential effect that advice of counsel may have in the overall assessment of bad faith is particularly acute given that the district court concluded that Sugar's conduct was "indicative of bad faith" based on several events that were directly tied to information within the specialized knowledge and counsel of her bankruptcy attorney. Principally, of course, was the failure to abide by the Local Rule. But the bankruptcy court also pointed to its usual practices when non-exempt property accrues in value, information that Sugar cannot be expected to know given that she is a one-time debtor (not a repeat filer) and her attorney repeatedly told her that her residence was exempt. The court also reasoned that "[e]ven if the Debtor did not believe the Local Rule applied to the sale of the [residence], the proper course of action would have been to request confirmation from the court." J.A. 739. However, that again imputed to Sugar—who was represented by counsel in her Chapter 13 proceeding—the responsibility and duty to ignore her lawyer. Similarly, the bankruptcy court appears to have faulted Sugar for not personally "attend[ing] the status conference scheduled to inquire about the potential sale of the

27

Property" when there's no indication in the record that Sugar was ordered to appear personally and her attorney did attend. J.A. 739.

The bankruptcy court's failure to consider the totality of the circumstances demonstrated in the record is particularly troubling here given that it had the option of imposing several less-harsh remedies to address Sugar's changed financial condition and violation of the Local Rule, including modification of the Plan or conversion to Chapter 7. The bankruptcy court's explanation must be sufficient to understand the nature of its findings as to what about Sugar's own conduct warranted the specific remedy of dismissal. Here, the court's explanation fell short.

We note, for example, that the bankruptcy court's analysis of bad faith and cause to dismiss interchangeably referred to Sugar and Sasser's acts and representations as one, and it failed to consider how advice of counsel factored into its assessment of bad faith on the part of Sugar. And, specifically, it failed to consider this component in explaining what about her entire conduct, a significant part of which was her reliance on Sasser's advice, was egregious enough to warrant dismissal. Because evidence in the record demonstrates that Sugar relied on Sasser's incorrect advice that her residence was exempt and that no court order was required, and because the bankruptcy court did not consider that evidence as part of its determination that "cause" to dismiss existed under § 1307(c), the bankruptcy court's judgment as to Sugar must be vacated and the matter remanded for the court to undertake the required review under a totality-of-the-circumstances standard.

Apart from § 1307(c), advice of counsel is also relevant to two components of a sanctions-based decision to dismiss a bankruptcy proceeding or to impose a refiling

prohibition.[11] In that context, we have recognized that "[a]dvice of counsel may be a defense in a criminal contempt proceeding because it negates the element of willfulness." *In re Walters*, 868 F.2d at 668. But it is not a "defense" to holding someone in *civil* contempt because "lack of willfulness is not a defense in a proceeding for civil contempt." *Id.* Consistent with this framework, the Supreme Court in *Taggart* reiterated that the standard for holding someone in contempt is objective, rather than subjective, and that "a party's subjective belief that she was complying with an order ordinarily will not insulate her from civil contempt if that belief was objectively unreasonable." 587 U.S. at 561. And, in light of *Taggart*, we recognized that even though advice of counsel would not ordinarily be a defense to the finding of contempt itself, "a party's reliance on guidance from outside counsel may be instructive, at least in part, when determining whether that party's belief that she was complying with the order was objectively unreasonable." *Beckhart*, 31 F.4th at 278 n.*. What's more, *Taggart* recognized that "a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." 587 U.S. at 562.

Pulling these principles together reflects the following implications for Sugar's case. Advice of counsel would be relevant to determining whether to impose sanctions because it could negate a finding of "willfulness," which is required to impose sanctions under the local rule authorizing them. E.D.N.C. LBR 9011-3(a); *see In re Walters*, 868 F.2d at 668.

---

[11] Although the bankruptcy court relied on § 1307(c) to order dismissal, it appears to have viewed the five-year prohibition on refiling as a sanction reviewable under *Taggart*. It's not entirely clear whether the basis for the sanction was the court's general power to hold a party in contempt or the EDNC's local rule authorizing sanctions for willful violations of the Local Rules. *See* E.D.N.C. LBR 9011-3(a).

And even though "advice of counsel" is not ordinarily a defense to imposing civil contempt sanctions under § 105(a) under *Taggart* and *Beckhart*, it may prove relevant to determining whether Sugar's belief that she was complying with the rules governing her conduct was "objectively unreasonable." *Taggart*, 587 U.S. at 561; *Beckhart*, 31 F.4th at 278 n.*. While an advice-of-counsel defense poses no absolute bar to imposing some sort of sanction, to the extent it would demonstrate Sugar's good faith belief, it would be relevant to deciding the type of sanction to impose. *Taggart*, 587 U.S. at 562.

For these reasons, Sugar's reliance on advice of counsel was directly relevant to the bankruptcy court's decision whether to impose sanctions in the form of dismissal or a prohibition on filing for bankruptcy for five years. Yet the bankruptcy court did not consider that factor at all, which was error and requires consideration on remand.

2.

In contrast to Sugar, Sasser bears full responsibility for his actions advising Sugar incorrectly in this case. The record ably supports that the bankruptcy court did not abuse its discretion in sanctioning him with a fine of $15,000. Notably, Sasser's chief argument in opposing the order against him is to reiterate that the sale of Sugar's residence did not violate the Local Rule. But we have previously rejected that argument.

The record shows that Sasser has been a licensed member of the bar for over two decades, and has practiced consumer bankruptcy law in North Carolina for most of that time. He has appeared in numerous Chapter 13 bankruptcy cases not just in the Eastern District of North Carolina, but before the same bankruptcy judge presiding over Sugar's Chapter 13 proceeding. The bankruptcy court reasonably held Sasser responsible for

30

USCA4 Appeal: 24-1374   Doc: 39   Filed: 03/12/2025   Pg: 31 of 34

understanding his client's confirmed Plan, including the numerous rules that governed his client's conduct. Further, he was reasonably held responsible for knowing case law from this Court and the bankruptcy court regarding how those rules applied to his client.

Of particular concern leading to the bankruptcy court's determination was Sasser's advice to Sugar he knew to be wrong based on a prior decision by the same bankruptcy judge interpreting the scope of the Local Rule in similar circumstances in a case in which Sasser represented the debtor. *In re Pulliam*, No. 19-03887-5-DMW, 2020 WL 1860113 (Bankr. E.D.N.C. Apr. 13, 2020). The court's ruling in that case informed Sasser of numerous legal rulings that rejected identical arguments (and variants of arguments) he made in that case, and that he later made in Sugar's case regarding whether the Local Rule applied to vested property, the scope of North Carolina's Homestead Exemption, and the effect of paying off an unpaid balance due on the Plan when the Plan's applicable commitment period had not ended. Whatever Sasser's views of the propriety of the bankruptcy judge's decision in *Pulliam*, he did not challenge it in an appeal. Nor did he preemptively raise these arguments as grounds for not requiring Sugar to obtain a court order before she attempted to sell her residence.[12] Instead, he waited to raise his arguments against the applicability of the Local Rule to the sale of Sugar's residence only *after* advising his client in a manner inconsistent with the Plan and only *after* Sugar had sold her property without a court order. Further, his advice fell well after this Court and the

---

[12] We also observe that *Pulliam* rested on non-binding, but extant, unpublished Fourth Circuit case law (*Reeves*) and Supreme Court precedent to set forth persuasively why the Local Rule would apply to the sale of a residence in a pending Chapter 13 proceeding.

31

bankruptcy judge presiding over Sugar's case had both expressed prior interpretations of at least some of the relevant provisions that were contrary to Sasser's position. That obstinate conduct demonstrates the requisite willfulness and bad faith on Sasser's part to support the bankruptcy court's decision to sanction him under § 105(a), its inherent contempt authority, and Local Bankruptcy Rule 9011-3.[13]

Relatedly, the docket in Sugar's Chapter 13 proceeding also demonstrates that Sasser had reasonable notice that the Local Rule would apply to the sale. As just two examples, the Bankruptcy Administrator filed the motion for a status conference directly in response to the potential sale of the residence without a prior court order and Sasser decided to file a motion for a court order authorizing the sale that he later withdrew. Thus, the concern about the Local Rule's applicability had been flagged in advance of the sale.

In affirming the bankruptcy court's sanction order against Sasser, we want to be clear that attorneys are called to diligently represent their client's interests and that fulfilling this duty does not immediately expose them to potential sanctions. Attorneys can and should advance viable positions with uncertain and unsuccessful outcomes or encourage changes in the law in a manner that is consistent with the court's rules and the proper times for doing so. But that is not the type of conduct that formed the basis of the bankruptcy court's sanctions against Sasser. Here, the court cited Sasser's reckless advice

---

[13] The bankruptcy court also relied on Rule 9011 of the Federal Rules of Bankruptcy Procedure to support sanctions for Sasser's decision to withdraw the motion for a court order without Sugar's authorization and without disclosing that Sugar had already closed on the sale of her residence. Given our affirmance of the other grounds for sanctioning Sasser, we need not review these specific findings or this ground.

32

to his client in the face of *numerous* signals—including from the judge presiding over Sugar's proceeding—indicating that he was incorrectly advising her that the Local Rule did not apply to the sale of her residence and she did not need a court order before proceeding. Nevertheless, Sasser persisted, advising his client in a manner that was contrary to the law and against his client's interests.

Because the record fully supports the bankruptcy court's determination that Sasser willfully advised his client to violate the Local Rule and there was "no fair ground of doubt" as to whether the Plan and the Local Rule permitted the sale of Sugar's residence without a prior court order, we affirm the order of monetary sanctions against Sasser. *Taggart*, 587 U.S. at 557 (emphasis omitted).[14]

III.

For the reasons stated above, we affirm the bankruptcy court's determination that Sugar's sale of her residence without first obtaining an order from the bankruptcy court violated the terms of the Local Rule, which she agreed to be bound by in her confirmed Plan. But we vacate the judgment insofar as it ordered the dismissal of Sugar's Chapter 13 proceeding and barred her from refiling for bankruptcy for five years. And we remand the case so that the bankruptcy court can assess the record evidence relating to Sugar's bad

---

[14] Notably, while Sasser urges that the bankruptcy court abused its discretion in imposing monetary sanctions, his arguments about this point remain focused on the viability of his legal position about the Local Rule's applicability to Sugar's sale of her residence. He does not specifically take issue with any of the court's remaining findings or its legal authority for doing so.

faith, and particularly how her reliance on advice of counsel factors into the overall assessment, in determining what relief or sanctions were appropriate in light of the violation of the Local Rule and Sugar's confirmed Plan. Last, we affirm the district court's order affirming the bankruptcy court's imposition of monetary sanctions against Sasser.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*