**SO ORDERED.**

**SIGNED this 15 day of August, 2025.**



_____
**David M. Warren**
**United States Bankruptcy Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:                                                    CASE NO. 19-04279-5-DMW

**CHRISTINE M. SUGAR**

                                                                           **CHAPTER 13**

                **DEBTOR**

## MEMORANDUM OPINION ON ORDER
## VACATING DISMISSAL AND SANCTIONS AND ALLOWING DISCHARGE

This matter comes on to be heard upon the amended Order ("USCOA Order") entered by the United States Court of Appeals for the Fourth Circuit ("USCOA") on March 12, 2025 and the Order ("USDC Order") entered by the United States District Court for the Eastern District of North Carolina ("USDC") on April 30, 2025, concerning appeals by Christine M. Sugar ("Debtor") of the Order Dismissing Case and Barring Future Petitions ("Dismissal Order") entered by this court on February 10, 2023 pursuant to a hearing ("Dismissal Hearing") conducted on August 17, 2022.

The Dismissal Order dismissed the Debtor's Chapter 13 case and sanctioned her by barring her from filing a petition under any chapter of the United States Bankruptcy Code in any federal district for a period of five years. The USCOA Order and the USDC Order remanded the Dismissal Order to this court to "assess the record evidence relating to [the Debtor's] bad faith, and particularly how her reliance on advice of counsel factors into the overall assessment, in

determining what relief or sanctions were appropriate in light of the violation of [E.D.N.C. Local Bankruptcy Rule 4002-1(g)(4)] and [the Debtor's] confirmed Plan." *Sugar v. Burnett*, 130 F.4th 358, 380 (4th Cir. 2025).

The record evidence from the Dismissal Hearing was insufficient for the court to determine if the Debtor received advice from counsel that would mitigate or absolve her from the sanctions imposed by the court in the Dismissal Order, so the court conducted an evidentiary hearing ("Remand Hearing") on May 21, 2025. At this hearing the Debtor was represented by successor counsel, Joseph A. Bledsoe III, Esq.[1] Michael B. Burnett, Esq. ("Trustee") and Brian C. Behr, Esq. ("BA") appeared in their respective capacities as the Chapter 13 trustee for the Debtor's case and the United States Bankruptcy Administrator.

On June 18, 2025 the court entered an Order Vacating Order Dismissing Case and Imposing Sanctions ("Vacating Order") that revoked the Dismissal Order and allowed the Debtor to receive her discharge. This Memorandum Opinion provides the findings of fact[2] and conclusions of law to support the Vacating Order.

## Jurisdiction

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the court has the authority to hear and determine the matter pursuant to 28 U.S.C. § 157(b)(1). The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a) and 1334 and the General Order of Reference entered on August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

---

[1] Travis Sasser, Esq. ("Mr. Sasser") represented the Debtor during her dismissed bankruptcy case and her appeals to the United States District Court and the Fourth Circuit Court of Appeals. At some point after entry of the USCOA Order, the Debtor and Mr. Sasser discontinued their engagement, and the Debtor retained Mr. Bledsoe.

[2] The facts from the Dismissal Hearing are more completely detailed in the Dismissal Order.

<u>Appellate Considerations</u>

The appeal process is critical to the judicial process. It corrects errors of an inferior court, and decisions of this court are reviewed on appeal as follows: "[L]egal conclusions are reviewed de novo, but findings of fact will only be set aside if clearly erroneous." *Schlossberg v. Barney*, 380 F.3d 174, 178 (4th Cir. 2004).

In this case the USCOA did not appear to find that any of the findings of fact were erroneous; however, the USCOA did find that based upon the arguments made on appeal, this court must reconsider the Debtor's defense of reliance upon counsel. This case is one of those rare exceptions where, through very poor advice and fundamentally misguided counseling, the truth of the Debtor's case was not revealed until the Remand Hearing.[3] Based upon the testimony at the Remand Hearing, the arguments of counsel and the court record, the court makes the following findings of fact and conclusions of law:

<u>Background and Prior Appellate Actions</u>

1. The Debtor, represented by Mr. Sasser, filed a voluntary petition for relief under Chapter 13 of the United States Bankruptcy Code on September 18, 2019. During most of the case, John F. Logan, Esq. served as the Chapter 13 trustee. Mr. Logan retired from service, and the Trustee was appointed on January 3, 2023 to fulfill the duties as provided in 11 U.S.C. § 1302. The court closed the case on August 13, 2024, and discharged the Trustee. The court reopened the case on May 1, 2025, and the Trustee was reappointed on May 7, 2025.

---

[3] At the May 21, 2025 hearing the Debtor provided extraordinary, compelling and unimaginable testimony about the advice she received from her counsel before and after the entry of the Dismissal Order. This testimony paints a completely different picture than the one presented at the Dismissal Hearing. This Memorandum Opinion will highlight that testimony.

2.    When the Debtor filed her petition, she owned real property ("Property") located at 3948 Wendy Lane in Raleigh, North Carolina valued at $150,000. The Debtor estimated that she had equity in the Property in the amount of $32,348.81, and she claimed that entire amount as exempt pursuant to N.C. Gen. Stat. § 1C-1601(a)(1), known as North Carolina's "homestead" exemption.

3.    On September 20, 2019, the court entered an Order and Notice to Debtor ("Order and Notice") imposing certain requirements on the Debtor during the pendency of her case including, *inter alia*, she could not dispose of any non-exempt property having a fair market value of more than $10,000 by sale or otherwise without prior approval of the trustee and an order of this court.[4]

4.    The Debtor filed a Chapter 13 Plan ("Plan"), and on November 22, 2019, the court entered an Order ("Confirmation Order") confirming the Plan. Under the terms of the Plan, the Property vested in the Debtor upon confirmation. The Confirmation Order stated the Debtor could not transfer any interest in real property without prior approval of the court except as provided in the Local Rule.

5.    On June 9, 2022, the BA requested a status conference after becoming aware that the Debtor may be planning to sell the Property without approval of the court. The following day, and after the court had scheduled a status conference to be held on June 29, 2022, the Debtor filed a Motion ("Sale Motion") seeking court approval to sell the Property. The Sale Motion included

---

[4] The Order and Notice is routinely entered in each Chapter 13 case, and the provision noted above mirrored the language of this court's Local Bankruptcy Rule 4002-1(g)(4) ("Local Rule") in place at the time of the Debtor's petition. At that time, the Local Rule provided the following: "DISPOSITION OF PROPERTY. After the filing of the petition and until the plan is completed, the debtor shall not dispose of any non-exempt property having a fair market value of more than $10,000 by sale or otherwise without prior approval of the trustee and an order of the court." E.D.N.C. LBR 4002-1(g)(4) (2019).

4

as an exhibit an Offer to Purchase and Contract executed by the Debtor as seller of the Property on April 12, 2022.  The Sale Motion stated the Debtor desired to sell the Property for $222,000.

6. The court scheduled the Sale Motion to be heard on July 7, 2022; however, prior to the June 29, 2022 status conference, the Debtor withdrew the Sale Motion on June 20, 2022.  The Debtor's counsel confirmed at the status conference that the Debtor sold the Property.  From the sale the Debtor received sale proceeds in the amount of $94,408.10. She used a portion of those proceeds to pay the balance owed under her Plan earlier than provided in the Plan.

7. The Trustee sought to increase the dividend to unsecured creditors by a Plan modification based on the Debtor's receipt of the sale proceeds.  In the alternative, the Trustee requested conversion to Chapter 7 or a dismissal with prejudice pursuant to 11 U.S.C. § 1307(c).  The Trustee based his request upon the Debtor's apparent willful failure to comply with the Order and Notice, the Confirmation Order and the Local Rule.

8. The Debtor, through counsel, asserted she became entitled to an immediate discharge under 11 U.S.C. § 1328(a) when she paid the balance of the Plan base, and the court was precluded from granting the relief requested by the Trustee.  The Debtor also argued she did not violate the Local Rule, and she challenged the validity of the Local Rule.

9. This court found at the Dismissal Hearing that the actions taken by the Debtor were intentional and violated the Orders of this court, and the Debtor appeared unapologetic for those actions, resulting in a dismissal of her case and a five-year bar to any future bankruptcy filing in any district.

10. The Debtor appealed the Dismissal Order to the USDC which affirmed the Dismissal Order.  The Debtor then appealed to the USCOA which remanded this matter to the

5

USDC for remand to this court to determine the extent of the reliance of the Debtor upon the legal advice given to her during the bankruptcy case.[5]

Evidence at the Remand Hearing

11.     At the Remand Hearing the BA called the Debtor, now represented by Mr. Bledsoe, to testify.[6]  Her testimony was significantly different than at her previous hearing, and she was not combative but instead cooperative and apologetic.

*Attorney Engagement*

12.     The Debtor outlined her engagement with Mr. Sasser to whom she was referred for bankruptcy law services by her then employer, the law firm of Smith Debnam Narron Drake Saintsing & Myers, LLP.  She acknowledged that she was aware that she needed to advise Mr. Sasser of any changes in her financial situation until she completed her Plan and received her discharge, and she understood that Mr. Sasser would advise her if she needed to take any related action.  The Debtor relied upon Mr. Sasser's advice to her detriment.

*Prior Disclosures of Inheritance to Mr. Sasser*[7]

13.     After the Plan was confirmed, the Debtor's mother became terminally ill, and on October 16, 2020, the Debtor notified Mr. Sasser by email that she would probably be receiving a

---

[5] This court entered an Order dated July 21, 2023 ("Sanctions Order") imposing sanctions against Mr. Sasser in the amount of $15,000 in connection with his representation of the Debtor in relation to the sale of the Property. On April 23, 2024 the USDC affirmed the Sanctions Order, and the USCOA jointly considered the Dismissal Order (the subject of this Memorandum Opinion) with the appeal by Mr. Sasser of the Sanctions Order.  The USCOA affirmed the April 23, 2024 USDC Order affirming the Sanctions Order.

[6] While much of the Debtor's testimony about her conversations with Mr. Sasser is hearsay, the testimony was allowed, without objection, for the court to evaluate the Debtor's understanding about the sale process and actions in the Dismissal Hearing.

[7] This evidence was previously unknown to the court and the Trustee. The Debtor did not testify at the Dismissal Hearing about receiving any post-petition assets from her mother's inheritance.  While not directly germane to the issue on remand, the Debtor's disclosures to Mr. Sasser mitigate the finding of the Debtor's bad faith.  This new evidence also presents some ethical concerns surrounding Mr. Sasser's failure to disclose to the Trustee or the court this post-petition acquisition of property.

small inheritance from her mother before she completed the Plan. On that same day Mr. Sasser advised her of two alternatives to "prevent difficulties from a chapter 13 perspective." The first was to have her mother place the Debtor's share of any inheritance in a trust and make it only available for the Debtor's health, welfare and education. The second suggestion was to have the Debtor's mother disinherit the Debtor with instructions to the other beneficiaries to pay the Debtor her fair share over time as requested.

14. The Debtor formally notified Mr. Sasser in an email dated January 27, 2021 of a $7,000 beneficiary disbursement from a life insurance policy owned by her mother. The Debtor also advised of additional anticipated distributions including another life insurance distribution in an expected amount of less than $1,000, a one-third share of proceeds from a pension of about $60,000 and one-third of the net value of her mother's home upon its sale. The Debtor specifically asked:

> I want to check in to see what I need to report to you. How large of an amount am I required to declare to the bankruptcy court? Am I able to freely use this money as I need (specifically with regard to the $7000 check I have right now) or do I have to wait for a judgment or a hearing? . . . The most significant question for me is - am I able to access that $7000 now without any fear of penalty- I am still on unpaid medical leave from work and need it to cover the household costs.[8]

15. Mr. Sasser responded by copying and pasting the language from the Order and Notice dealing with financial and address changes,[9] accompanied by the following advice:

---

[8] *See* Remand Hearing Exhibit 1.

[9] (4) Financial/Address Changes: You must notify your attorney and the trustee of any change of mailing address or employment. You must notify the court of any change in mailing address. You must also promptly notify your attorney and the trustee of any substantial changes in your financial circumstances, including substantial changes in your income, expenses, or property ownership. Examples of changes that would require you to give notice include, but are not limited to, if you
    (a) Get a raise or change[] jobs and your income changes substantially;
    (b) Move and your housing or utility costs change substantially;
    (c) Win the lottery;
    (d) Become entitled to inherit property;
    (e) Become entitled to combined tax refunds of $2,000 or more for any tax year.

7

> Below . . . sets forth reporting requirements. The reporting kicks in if it is substantial. You can use the money without restriction. It is possible a plan modification can be sought and if successful the required payment amount would increase. But you can still hold on to all the money. The current base payoff amount is $8,932 but you must be in chapter 13 for 36 months and this is only month 16. The total face amount of general unsecured claims filed in your case is $34,986.00. If a modification were proposed by a trustee or creditor then the court has to account for quite a few different factors in deciding whether or not the modification should be approved or disapproved. Again, there are no restrictions on what you do with the money you have received.[10]

16. After receiving the above communication from Mr. Sasser, on January 27, 2021, the Debtor asked for further clarification:

> I am finally understanding that it's not that they would take the money I get, it's that they could make a modification to raise how much I pay each month, right? Or is that an oversimplification?
>
> Is my email to you considered notification for the $7000 Life insurance benefits I currently have or is there a more formal declaration process?[11]

17. Mr. Sasser responded that same day as follows:

> Your understanding is correct. If a modification is sought we will certainly oppose that. The email you sent is an adequate notice for the requirement that your attorney be notified. Thanks. There is no formal declaration process for insurance, bequest and inheritances you become entitled to receive after March 17, 2020.[12]

18. On March 8, 2021 the Debtor updated Mr. Sasser as follows:

> On 3/4, there were direct deposits made into my checking account in the amounts of $8,719.89 and $9,617.58. If the source/purpose of the money matters - they are from Prudentia [sic] and combined, they are my portion of my mom's pension.[13]

---

These obligations continue throughout the complete term of your chapter 13 plan. Contact your attorney for advice on whether a change is substantial and must be reported.

[10] *See* Remand Hearing Exhibit 1.

[11] *Id.*

[12] *Id.*

[13] *Id.*

8

19. At the Remand Hearing the Debtor stated that at the time it was her belief that by notifying Mr. Sasser of the money received, she had done all she needed to do to disclose the inheritance. These communications corroborate that understanding.

20. Mr. Sasser did not notify the Trustee or the court of this substantial change in the Debtor's financial situation, nor did he file any report advising of the inheritance.[14]

*Sale of the Property*

21. In addition, and just as important to the Debtor, the Debtor's financial situation, even with the anticipated inheritance, was rapidly deteriorating. She had been on medical leave from her employment, and the medical bills were becoming insurmountable. She inquired of Mr. Sasser about what might happen if she sold the Property. With the risk of a possible modification to her Plan in the event of a sale of her house, she was concerned about any adverse change in her current financial situation.

22. In email exchanges between the Debtor and Mr. Sasser on November 1 and 2, 2020 the Debtor advised of her possible need to sell the Property and inquired whether she would be able to retain the net proceeds (approximately $50,000 based on the Debtor's estimate of the Property's value at the time) upon the sale. Mr. Sasser responded twice by saying the Debtor would be able to retain all net proceeds of a sale of her house.[15] He warned that a trustee or unsecured creditor could seek to modify the Plan, but he did not think the amount of proceeds would be sufficient to warrant a modification, characterizing any increase in value as "normal as opposed to out of the ordinary."[16]

---

[14] Mr. Sasser has previously failed to disclose matters to the court. *See In re Beasley*, Case No. 21-02322-5-PWM; *In the Matter of Travis P. Sasser*, Grievance Committee of the North Carolina State Bar, 24-G-1077.

[15] *See* Remand Hearing Exhibit 2.

[16] *Id.*

23. Ultimately, the Debtor determined that selling the Property was absolutely necessary to obtain the cash equity for her expenses, and she communicated with Mr. Sasser about the pending sale.

24. During the Remand Hearing the Debtor emphatically testified that at no time prior to the sale did Mr. Sasser advise her that court permission was required to sell the Property. She did not know at that time, but later learned through this litigation, that the Local Rules of this court required that permission prior to selling the house. She also was not advised by Mr. Sasser of any risk to her or to her bankruptcy case by not obtaining that permission.

25. The court examined the Debtor at the Remand Hearing after counsel concluded their examinations, asking for an explanation of the change from the Debtor's adamant and almost defiant position of not needing the court's permission to sell the Property in 2022. Now, contrite and apologetic, the Debtor understands that Mr. Sasser was wrong, and that court permission was needed for that asset disposition. The court attempted to reconcile the difference in testimony over the three years. The Debtor responded that back in 2022, she never considered asking for permission or for forgiveness for her actions because her attorney "wanted the appeal" for the purpose of challenging the Local Rule. The Debtor now knows that her actions were based upon poor and erroneous advice. She said she just did not know her actions were improper.

*The Debtor's Reliance on Mr. Sasser's Counsel*

26. The Debtor stated that had she known that not obtaining permission would result in an adverse position, she would have never sold the Property without a court order. Mr. Sasser advised that the Property was exempt and that, because property of the Debtor's estate vested at confirmation of the Plan, no court permission was needed for the sale. The Debtor relayed that Mr. Sasser said the Local Rule (requiring permission to sell the Property) was a "fluke" and "not

10

the norm," and that the wider opinion was contrary to the court's implementation of the Local Rule. At the time the Debtor was unaware that another client of Ms. Sasser had argued, unsuccessfully, that this court should interpret the Local Rule in the way Mr. Sasser believed it applied to the Debtor and the Property.[17] She stated that she was not advised of the risks, including a dismissal with prejudice, for not obtaining court permission to sell the Property and thought Mr. Sasser's representation was inadequate for not advising her of the risks. The Debtor has subsequently expressed sincere remorse for not complying with the Local Rule when she sold the Property. She stated:

> I guess it [was a] naïve belief that I was paying someone to represent me, and I put my full trust [in Mr. Sasser]. . . . I truly believed that he had my best interest at heart, and that he was advising me. It wouldn't have occurred to me to think otherwise that someone that I was paying to help me wouldn't help me.

The Debtor apologized for not following the proper procedures for selling the residence.

27. At the time of the evidentiary hearing on August 17, 2022, the Debtor thought Mr. Sasser was acting in her best interest; however, after learning more and understanding the ramifications of Mr. Sasser's advice and actions, the Debtor firmly believes Mr. Sasser was not acting in her best interest. Rather, he was acting in the interest of his "crusade."[18] During Mr. Bledsoe's examination of the Debtor, he asked her the following: "I would describe [Mr. Sasser] as a zealot. Would you agree with that?" The Debtor responded in the affirmative.

---

[17] *See In re Pulliam*, No. 19-03887-5-DMW, 2020 WL 1860113 (Bankr. E.D.N.C. Apr. 13, 2020).

[18] The Debtor explained that Mr. Sasser's "crusade" was based on his strong feelings regarding the Local Rule and interpretations of the language therein. Mr. Sasser, allegedly at the request and for the benefit of his clients, has unsuccessfully challenged the court's Local Rules in the past several years. *See In re Pulliam*, No. 19-03887-5-DMW, 2020 WL 1860113 (Bankr. E.D.N.C. Apr. 13, 2020); *In re Butala*, No. 15-02624-5-SWH (Bankr. E.D.N.C. July 10, 2018); *In re Ripley*, No. 14-01265-5-DMW, 2018 WL 735342 (Bankr. E.D.N.C. Feb. 6, 2018). It is unknown if those clients were adequately informed of the risks of taking those positions.

28. The Debtor further stated she paid $5,000 to Mr. Sasser for his representation and is convinced she did not receive adequate representation for the money she paid. In fact, she believes she is in a worse position because of that representation.

29. The Debtor established through her testimony that her reliance upon Mr. Sasser's advice and counsel was reasonable and justified. At the Remand Hearing the Debtor provided a copy of an email from November 2, 2020 where she provided the following information to Mr. Sasser:

> Regarding the disability, I was not diagnosed until Aug/Sept of this year, so that knowledge wasn't available at the time of the initial confirmation [hearing]. I was diagnosed as autistic . . . . It also directly impacts my ability to negotiate effectively with others and puts me at a direct disadvantage when having to self-advocate - I am easily taken advantage of . . . .[19]

30. The Debtor had requested Mr. Sasser relay to the court the medical problems that the Debtor was having, including her autism diagnosis. Unknown to her, Mr. Sasser never mentioned the autism diagnosis. The Debtor stated that she thought the court simply disregarded her infirmities. The Debtor's autism likely impacted her ability to explain at the Dismissal Hearing the circumstances regarding the sale of the Property and why she trusted her counsel to take any action that would be required by the court for the sale.

31. The Debtor stated that her continued financial problems have adversely impacted her life. She relayed that her friends and acquaintances distance themselves from her because it was her impression that those friends and acquaintances assumed the Debtor would be asking them for money. She no longer can work in her chosen field due to policies precluding her from being entrusted with money because of her "negative bankruptcy." The entire experience has impacted her physical and mental health and caused her significant discomfort and depression.

---

[19] See Remand Hearing Exhibit 2.

32. The court finds, according to the Debtor's testimony, that her reliance upon her prior counsel's advice was justified and reasonable, and that the sanctions the court imposed, while properly based upon the facts, testimony and arguments of counsel at that time, are not supported by the uncontroverted facts that have now, three years later, been presented to the court.

While the court has already granted the Debtor relief in the Vacating Order, the Debtor's testimony raises some professional matters that should be examined by the BA, and the BA is invited to undertake any investigation and analysis that he deems appropriate for consideration by the court or the North Carolina State Bar. The court, in its discretion, may issue a Show Cause Order dealing with the professionalism issue revealed at the Remand Hearing.

END OF DOCUMENT